**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **In re:**<br><br>**J.C. PENNEY DIRECT MARKETING SERVICES LLC, et al** | §<br>§<br>§<br>§<br>§<br>§ | **Chapter 11**<br>**Case No. 20-20184 (CML)**<br><br>**(Jointly Administered)**<br>**(Formerly Jointly Administered under J.C. Penney Company Inc., 20-20182)** |
| **OLD COPPER COMPANY INC. F/K/A JC PENNEY COMPANY INC. AND COPPER SUB CORPORATION INC. F/K/A JC PENNEY COPORATION INC., AS WIND DOWN DEBTOR IN JC PENNEY DIRECT MARKETING SERVICES LLC**<br><br>**Plaintiff**<br>**v.**<br><br>**JACKSON WALKER LLP**<br>**Defendant** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | <br><br>**Adversary No. 25-02002** |

## FIRST AMENDED COMPLAINT

The Old Copper Company, Inc. f/k/a J.C. Penney Company Inc. and Copper Sub Corporation Inc. f/k/a J.C. Penney Corporation Inc., as Wind Down Debtor in J.C. Penney Direct Marketing Services LLC ("Plaintiff") files this First Amended Complaint against Jackson Walker LLP ("JW") and would show the Court as follows:

## I. INTRODUCTION

1. The conclusion drawn by Judge Isgur as expressed in his September 20, 2024, disciplinary referral of JW says it all:

> **"Jackson Walker's deliberate failure to inform its clients [of the Relationship] was an ethical breach that we cannot excuse."[1]**

[1] *See* Exhibit A, September 20, 2024, letter from the Hon. Marvin Isgur to Chief United State District Judge Randy Crane Re: Referral of Jackson Wallker LLP (the "Disciplinary Referral") at 4 (emphasis added).

2. Regrettably, Judge Isgur was only the latest to warn JW of its obligations to its clients. When allegations of the Relationship arose, JW immediately sought advice from Ethics Counsel and crisis management professionals. JW ignored these professionals who clearly advised JW that it had to inform its clients. When a law firm is disregarding the advice of its Ethics Counsel, things are seriously wrong. JW has not disclosed any reason for this lapse – but still complains that it might be held to account.

## II. SUMMARY OF THE COVER-UP[2]

3. JW partner Elizabeth Freeman ("Freeman") and (now former) Judge David R. Jones ("Jones") were in a romantic relationship beginning in 2013, at the latest (the "Relationship"). They co-owned a home located at 3530 Rolla Street, Houston, Texas (the "Rolla House") from 2017 forward.

4. JW represented JCP in the JCP Cases (defined below).[3] Jones presided over the JCP Cases. JW failed to inform JCP about the Relationship, *at any time*. Likewise, JW failed to make the necessary disclosures to the Court, creditors, and other parties-in-interest. Instead, JW consciously and deliberately made the economic decision to breach its duties to JCP, which rendered it no longer "disinterested" as required by the Bankruptcy Code. "It was the firm's duty to place the interest of its clients above its own interest."[4] JW's failure to do so was a breach of its duties to JCP, under the Bankruptcy Code, federal and Texas law, local rules, and the Rules of Professional Conduct. As a result, *all fees* JCP paid JW should be disgorged.

5. To the extent it has articulated any factual defenses, JW contends:

---

2 This case is not really about the Relationship. Rather, it is about JW's cover-up of that Relationship.

3 As used herein, "JCP" shall refer to J.C. Penney Company, Inc. and its affiliates in the JCP Cases set forth in footnote 7.

4 Exhibit 1 at 4

a. JW management knew nothing of the Relationship until March 2021.

b. When allegations of the Relationship surfaced in March 2021, JW conducted a factual investigation.

c. JW at all times consulted Ethics Counsel and followed their advice.

6. Unfortunately, the documents and testimony adduced in Case No. 23-00645, *In re Jackson Walker Fee Dispute* (the "Fee Dispute") indicate that JW's publicly stated defenses are incorrect, if not outright false. JW claims that only Freeman knew of the Relationship, and thus it was an innocent victim of Freeman's indiscretion. Instead, the facts show that multiple JW lawyers knew of the Relationship. JW engaged in a sustained cover-up of the facts and completely disregarded the firm's duties to clients, the courts, and parties in the bankruptcy cases. Then, when JW's upper management learned the facts, instead of rectifying the situation, management willfully participated in the cover-up. JW is liable for the repeated ethical failures of multiple lawyers at every level of the firm.

7. JW tries to excuse itself from liability based on the (alleged) fact that upper management did not know about the Relationship, at least for a while. However, that excuse fails as a matter of law. First, as observed by Judge Moses, knowledge of the Relationship by Freeman is imputed to JW.[5] Therefore, JW "knew" of the Relationship as of the date Freeman joined JW (at a minimum).[6] Additionally, by engaging in the continued cover-up after it undeniably knew

---

[5] On April 9, 2025, the Honorable Alia Moses, Chief Judge of the U.S. District Court for the Western District of Texas (sitting in the Southern District of Texas), entered an order withdrawing the reference for the Fee Dispute. *See*, Case No. 4:23-cv-04787, in the U.S. District Court for the Southern District of Texas [ECF 31].

[6] As indicated below, additional JW attorneys also knew of the Relationship – and their knowledge is also imputed to the firm.

about the Relationship, JW management adopted the bad acts and liability created by non-management partners and lawyers.[7]

8. JW's failure to disclose the Relationship is a clear breach of its fiduciary duty to JCP. Plaintiff need not establish damages resulting from such breach. The law in federal and state court supports disgorgement of all the fees JCP paid to JW.

## III. THE PARTIES, JURISDICTION, AND VENUE

9. Plaintiff is the successor to the associated debtors in possession in various chapter 11 cases filed in the Southern District of Texas by J.C. Penney Company, Inc. and certain of its affiliates (the "JCP Cases" or collectively, the "JCP Case").[8] The JCP Cases were jointly administered under Case No. 20-20182. All post-confirmation matters are administered under Case No. 20-20184, which remains open in this Court.

10. JW has been served with process and appeared in this matter.

11. This Court has jurisdiction over this matter under 28 U.S.C. § 1334(a) and exclusive jurisdiction under § 1334(e)(2). This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper under 28 U.S.C. § 1409(a).

---

[7] This Amended Complaint is based on the facts disclosed thus far. As indicated herein, some of the facts have been suppressed or evidence destroyed. To the extent JW has any counter factual narrative to present, JCP welcomes such disclosure.

[8] The "JCP Cases" include: 20-20182, J. C. Penney Company, Inc.; 20-20198, Future Source LLC; 20-20183, J.C. Penney Corporation, Inc.; 20-20184, J. C. Penney Direct Marketing Services LLC; 20-20185, J. C. Penney Export Merchandising Corporation; 20-20186, J. C. Penney International, Inc ; 20-20181, J. C. Penney Properties, LLC; 20-20187, J. C. Penney Purchasing Corporation; 20-20188, JCP Construction Services, Inc. ; 20-20189, JCP Media, Inc.; 20-20190, JCP New Jersey, LLC; 20-20191, JCP Procurement, Inc.; 20-20192, JCP Real Estate Holdings, LLC; 20-20193, JCP Realty, LLC; 20-20194,1 JCP Telecom Systems, Inc.; 20-20195, JCPenney Puerto Rico, Inc.; 20-20196, JCPenney Services, LLC; 20-20197, JCP SSC, Inc.

## IV. CHRONOLOGY OF THE COVER-UP

**The Relationship Exists Long Before Freeman Joins JW**

**2009:** Freeman works with Jones at Porter Hedges.

**2011:** Jones takes the bench on October 1, and Freeman leaves Porter Hedges to become Jones' briefing attorney.

**2013:** Freeman tells Jones court staff about the Relationship.[9]

**June 2017:** Freeman and Jones become co-owners of the Rolla House.[10],[11]

**Freeman joins JW Amid Rumors of the Relationship**

**2018**:

- *May*: Freeman leaves her job as Jones' briefing attorney to join JW as an income partner.[12]
- *July*: Veronica Polnick ("Polnick") begins working a law clerk to Jones and learns Freeman and Jones live together at the Rolla House.[13]

**2019:**

- *March*: Polnick joins JW as an associate in the bankruptcy section.
- *June*: Freeman's ex-husband Nick Simms ("Simms") references "the Liz/Jones casa in a gated community called cape royale" in a text message to a friend.[14]

**2020:**

- *April 19*: Simms sends a text message Freeman that references the fact that Freeman is living at the Rolla house.[15]

---

9 *See*, Exhibit 3, Excerpts of Deposition of Albert Alonzo at 63-65.

10 General Warranty Deed dated June 26, 2017, recorded in the Real Property Records of Harris County, Texas, File No. RP-2017-28445.

11 Sometime in 2020, Freeman's parents allegedly move into a house owned by Jones in the Lake Livingston area. (This is also never disclosed.)

12 Freeman is advanced to equity partner on January 1, 2021.

13 *See*, Exhibit 4, Excerpts of Deposition of Vernonica Polnick pp. 353-354.

14 Exhibit 5, Deposition of Nick Simms UST Exhibit 109.

15 Exhibit 6, Excerpts of Deposition of Nick Simms at 63-65.

**JW Serves as Co-Counsel in the JCP Cases**

**May 2020:**

- *May 12*: Freeman texts Polnick about Jones presiding over the JCP Case *three days before the case was filed.*[16]

  "Talked to Jones. He's got us."
  "Jones has been softening up on this for a month."
  "We are keeping this on the down looooooow."

- *May 13*: JCP officially retains JW as local counsel in the JCP Cases (without advising JCP of the Relationship).

**June 2020:**

- *June 11*: JW files its *Application to Retain Jackson Walker LLP as Co-Counsel and Conflicts Counsel for Debtors and Debtors in Possession*[17] in the JCP Case, supported by Matthew Cavenaugh's ("Cavenaugh") Declaration of Disinterestedness[18] that does not mention the Relationship.[19]

**July 2020:**

- *July 7*: Jones enters an *Order Granting the Application of Debtors and Debtors-in Possession to Retain Jackson Walker LLP as Co-Counsel and Conflicts Counsel for Debtors and Debtors-in Possession*[20], which requires JW to:

  > review its files periodically during the pendency of these chapter 11 cases to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, Jackson Walker will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration, as required by Fed. R. Bankr. P. 2014(a).

**December 2020**:

- *December 24*: Jones confirms JCP's Plan of Reorganization.[21]

**February 2021**:

- *February 5*: JW files an Interim Fee Application without making further disclosures.[22]

---

16 Exhibit 7 at 3-4.

17 Case No. 20-20182, ECF 685 (the "Retention Application").

18 *Id.*, ECF 685-2. (the "Cavenaugh Declaration").

19 *Id.*, ECF 685-2.

20 Case No. 20-20182, ECF 963 (the "Retention Order").

21 Case No. 20-20182, ECF 2190.

22 Case No. 20-20182, ECF 2561

**The Cover-Up Begins**

- **Before the March 10, 2021, Recusal Hearing**

**March 6, 2021 (Saturday) – The Allegations Come to Light**

- At 11:44 a.m., Michael Van Deelen ("Van Deelen"), a creditor in the *McDermott* case,[23] emails Cavenaugh with accusations about the Relationship (the "Allegations").[24]
- Within seven minutes, Cavenaugh asks Polnick to call him, and follows up 10 minutes later, saying "It's important and a little sensitive."[25]
- Polnick then meets with Cavenaugh in person.[26]
- At 1:55 p.m., Polnick texts Freeman, and they speak on the phone.[27]
- Within an hour and a half of the first text to Freeman, Polnick and Freeman meet at a restaurant.[28]
- Then Polnick meets with Cavenaugh again.[29]
- Cavenaugh tells co-counsel about the Allegations and says JW is "investigating."
- Freeman tells Cavenaugh that she was previously in a Relationship with Jones, but that it ended some time before 2021, and they do not live together.[30]

**March 7, 2021 (Sunday) – A Plan Begins to Form**

- Polnick alerts Jones' Courtroom Deputy Albert Alonzo ("Alonzo") (who also knows of the Relationship) about the Allegations and previews a filing the following day.[31]
- Cavenaugh tells Polnick that Bruce Ruzinsky, Chip Babcock, and Pat Cowlishaw ("Cowlishaw") (all JW upper management) are in the "circle" and have "signed off

---

[23] *Van Deelen v.* Dickson *(In re McDermott Int'l Inc.)*, Adv. No. 20-3309, (Bankr. S.D.Tex.), ECF No. 4 (July 23, 2020).

[24] Exhibit 8.

[25] Exhibit 9 at 2.

[26] *Id.*

[27] Exhibit 7 at 10.

[28] *Id.*

[29] Exhibit 9 at 2.

[30] Exhibit 2, Excerpts of Deposition of Matthew Cavenaugh.

[31] Exhibit 11 at 2.

on the plan." He says: "I feel so terrible. But if we want to protect her, this is the route."[32]

- Polnick raises concerns about the future of JW's bankruptcy practice.[33]

  > Polnick: "You think we get out of this with 1) freeman still at JW, 2) Jones still on the bench and panel, and 3) still working with KE?"
  >
  > Cavenaugh: "All 3"

**March 8, 2021 – Keeping the Allegations Under Wraps**

- Van Deelen files an addendum to an earlier-filed Motion to Recuse (the "Addendum") based on the Allegations.[34]
- Polnick coordinates with Alonzo to get the Addendum sealed. Alonzo says he will call Jones.[35]
- Polnick drafts and files a Motion to Seal the Addendum,[36] calling the Allegations "defamatory."[37, 38]
- After filing the Motion to Seal, Polnick heads to the courthouse to personally deliver it to chambers.[39]

**March 8, 2021 – Ethics Counsel – What Did We Do Wrong?**

- Cavenaugh spends three hours "re reading all of my declarations in prior cases[40]
- JW seeks advice from outside ethics counsel Peter Jarvis ("Jarvis" or "Ethics Counsel") of Holland & Knight.[41]
  - After having a call with Jarvis, Cowlishaw emails him: "I am still uncertain…on what rule our lawyer may have violated."[42]

---

32 Exhibit 9 at 5.

33 *Id.*

34 Adv. No. 20-3309, ECF 39.

35 Exhibit 11 at 2-3.

36 Adv. No. 20-3309, ECF 36.

37 Exhibit 4.

38 JW also claim the Addendum was filed under seal because of "concerns about Mr. Van Deelen's credibility…" *Preliminary Response of Jackson Walker LLP to Recent Filings by the Office of the United States Trustee*, Case No. 20-20184, ECF 1244 at ¶ 10.

39 Exhibit 11 at 3-5. Polnick and Cavenaugh decide Polnick will not make time entries for preparing and filing the motion to seal, presumably to prevent drawing attention to the Allegations. Exhibit 9 at 8-9.

40 *Id.* at 25.

41 *See generally,* Exhibit 12.

42 Exhibit 12 at 1.

- Jarvis points him to 28 U.S.C. § 455:

> My starting point here is 28 USC 455. See attached fairly old 5th Circuit case. If the bankruptcy court judge either had to recuse or had to disclose and get consent to continue, and if one or more of your firm's clients are or may be harmed as a result, then I think there are at least personal interest conflicts for the lawyer in the relationship.

- Cowlishaw requests "a complete statement of the rules applicable to the judge and those applicable to the lawyer/firm."[43]

**March 8-10, 2021 – Crisis Management – Getting the Ducks in a Row**[44]

***March 8***: JW also seeks expert advice from Androvett Legal Media & Marketing (the "PR Firm").[45]

- Barbara Malin ("Malin"), JW's marketing director, emails Mark Annick ("Annick") of the PR Firm: "I need to engage crisis communications assistance today."[46]
- A few hours later, Malin asks Annick for a call with her and Cowlishaw, JW's then general counsel, seeking advice "with talking points and a statement for both of these possible situations: a) if it is determined that no relationship exists and b) if it is determined that a relationship does exist."[47]
- Cowlishaw and Malin have two calls between 3:45 p.m. and 6:30 p.m.[48]

***March 9***: Annick provides advice that JW rejects.

- Annick sends a draft statement for JW's consideration.[49]

> Jackson Walker and its lawyers adhere to the highest standards of ethics and professionalism. The firm is conducting an internal investigation into this matter. When that investigation is complete and all the facts are known, we will take what steps may be necessary to maintain those standards.

- Cowlishaw pushes back on the proposed statement, raising concerns about holding JW to the "highest standard" and conducting an "internal investigation."[50]

---

43 *Id.*

44 Exhibit 13 at 68 ("Obviously, once the hearing ends we probably won't have much time to get our ducks in a row.")

45 *See generally,* Exhibit 13.

46 Exhibit 13 at 15.

47 *Id.* at 25.

48 *Id.* at 21-23.

49 *Id.* at 3-4.

50 *Id.* at 105.

- I would avoid holding us to higher than applicable standards and requirements (i.e., no "highest standards"). Maybe something along the lines of "For more than 100 years, Jackson Walker has served its clients with skill, commitment, and in compliance with ethical and professional requirements."
- We may want to say something supportive of our partner personally – e.g., "We know Liz Freeman to be an extraordinary lawyer and a person of integrity."
- Not sure about "investigation" – maybe "reviewing this matter to make sure our work in this court, as in all courts, is in compliance with all legal and professional ethical requirements." Trying to sound the theme of "we have a long history of doing things right", we know our partner to be someone who cares and does things right, and we're making sure that we will continue to do right in the future."

- Malin worries that "going all in on support for Liz might be a strategic mistake."[51]
- Cowlishaw expresses the need to strongly affirm Freeman "as a person and lawyer, without speaking directly to the propriety of her conduct in this instance."[52]
- Malin advises against being "perceived as throwing Liz to the sharks at the first opportunity."[53]
- Annick states: "if we can't affirm a commitment to the highest ethical standards, an outside observer or reader may wonder what sort of mid-level standards we do follow."[54] Annick also raises the issue of conflicts of interest:

  > "[W]e also feel an obligation – as your advocates in the PR and media space – to say that reporters and others encountering this are bound to see it as a clear conflict of interest, at the very least." (emphasis in original)

- Despite Annick's advice, JW doubles down on not holding itself to the "highest standards" and offers an alternative statement.[55]

"For more than 100 years Jackson Walker lawyers have served their clients with skill, commitment, and integrity. We take any assertion to the contrary very seriously and will review the facts and circumstances to make certain that our work here is consistent with these principles."

We understand the comments about "highest standards". Our judgment, for better or worse, is that we need to stay away from that or like phrases.

- Annick warns that the statement might sound defensive and proposes a minor change.[56]

For more than 100 years, Jackson Walker lawyers have served their clients with skill, commitment, and integrity. We are reviewing the facts and circumstances in this situation to make certain that our work is consistent with these principles.

---

51 *Id*. at 2.
52 *Id*. at 7.
53 *Id*.
54 *Id*. at 112.
55 *Id*. at 67.
56 *Id*. at 83.

- Malin anticipates having to make internal and external statements after the hearing on the Recusal Motion.[57]

***March 10:*** JW worries about what Jones might say.

- Before knowing the outcome of the hearing, Malin states that there is a "possibility that at today's hearing Judge Jones may acknowledge the relationship."[58]

➢ **After the March 10, 2021 Hearing**

**March 10:**

- Judge Isgur denies the motion, leaving the case pending before Jones, where the Allegations will remain under seal.
- After learning that the Allegations will remain sealed, Annick recognizes that JW has "a little bit of cover and time."[59]
- Less than 12 hours after the hearing, JW files its *Second Interim and Final Fee Application for Allowance and Payment of Fees and Expenses as Co-Counsel to the Debtors for the Period from May 15, 2020 Through December 14, 2020*, without any additional disclosures.[60]

**March 12:**

- JW refuses to give Annick a copy of the Van Deelen letter.[61]
- Jarvis suggests: "With respect to the financial interest issue, how about reconfiguring your partner's share so that it EXCLUDES any part of revenues from cases before Judge Jones?" Cowlishaw calls it "an interesting thought."[62]

**The Relationship is Not a Well-Kept Secret**

**April 2021:**

- *April 14*: Polnick's texts to Freeman show she knows Freeman is living with Jones:[63]

  "An accidental kick to the spine in the middle of the night would be ok."
  "I'm suggesting you kick someone in the spine in the middle of the night."

---

[57] *Id*. at 32.

[58] *Id*. at 51.

[59] *Id*. at 130. On March 12, JW refused to give Annick a copy of the letter containing the Allegations. This appears to be the last substantive communication with Annick.

[60] Case No. 20-20184, ECF 2739 (the "Final Fee Application").

[61] Exhibit 13 at 142.

[62] Exhibit 12 at 2.

[63] Exhibit 7 at 21-29.

> "I've kicked David in the spine a million times"
> "Wash only your clothes and not his next time you do laundry."
> "Switch out shampoo with hair." "Nair."
> "Take his suit pants to the cleaners and have them taken in 2 inches."
> "Replace toothpaste with preparation H."
> "Hide his fancy screwdrivers."

- *April 28*: Polnick and Alonzo texts show they know Freeman is living with Jones:

  > Alonzo: "Isn't she supposed to call it off when Jones, move out or quit."[64]

**May 2021:**

- *May 4*: Polnick texts with Freeman demonstrate that JW lawyer Genevieve Graham knows about the Relationship:

  > "She [Graham] obviously knows you have a relationship with Jones and she now knows that it quasi came out in McDermott and that there's high level firm shit going on."[65]

- *May 20:* Cavenaugh to Polnick re Freeman/Jones:[66]

  > "They've been very careful. Taken a lot of steps. Legal, very good. But the fact that they've taken so many steps makes it problematic from a pr standpoint."
  > Polnick: "They saw this coming 10 years ago."

- *May 20*: Polnick re JW managing partner Wade Cooper:[67]

  > "Apparently Wade only knows that they're friends and socialize and while he may suspect more he apparently doesn't know know."

**2021 – Ethics Advice Part II**[68]

**August 2021:**

- Almost six months after first consulting Ethics Counsel, JW's general counsel sends letter to Jarvis formally requesting advice.[69]
  - The letter represents that Freeman is not working on cases that are before Jones.

[64] Exhibit 11 at 8.

[65] Exhibit 7 at 34.

[66] Exhibit 9 at 42-43.

[67] *Id.* at 43.

[68] At no point in 2021 does it appear that Ethics Counsel was asked about duties to disclose the Relationship, or about bankruptcy disclosure obligations. It appears that JW never consulted a bankruptcy expert.

[69] Exhibit 12 at 3.

- The letter also says that Freeman is being screened from any share of the profits JW receives from working on cases in front of Jones.[70]
- The letter represents that Jones and Freeman never lived together – though JW never seems to have conducted an investigation into that fact – and even though Polnick knows otherwise.

**The Ongoing Relationship is Confirmed, But JW Does Not Change Course**

**January 2022**

- During a dinner with a client and friend, JW management committee member Ross Forbes learns Freeman is living with Jones. That person texts Freeman's ex-husband, who confirms that Freeman is living with Jones.[71]
  - That night, Forbes alerts other members of management. However, no one confronts Freeman until months later.

**March 2022:**

- JW finally confirms with Freeman she is living with Jones and has "rekindled the relationship"[72]

**April 2022:**

- *April 27:* Tom Kirkendall, Freeman's personal counsel, suggested the following addition to JW's bankruptcy disclosures:[73]

> Elizabeth Freeman is a partner in the Firm. Ms. Freeman is a former law partner of the Honorable David R. Jones, Chief Bankruptcy Judge of the Southern District of Texas, at the Houston-based law firm of Porter & Hedges from 2009-2011. She is also a former briefing attorney for Judge Jones from 2011-2018. Ms. Freeman maintains a close personal relationship with Judge Jones. Consequently, Ms. Freeman does not appear in court or provide her professional services on the Firm's cases in Judge Jones' court. Ms. Freeman does not have any financial interest in the Firm's cases in Judge Jones' court in that the Firm does not provide to her any compensation based on the Firm's cases in Judge Jones' court and her partner share of the Firm's profits does not include a share in any of the Firm's profits attributable to cases in Judge Jones' court.

- *April 28*: In response to Tom Kirkendall's proposed disclosure, Wade Cooper (JW managing partner), emailed Bruce Ruzinsky (JW bankruptcy group leader), Cowlishaw (former general counsel), and William Jenkins (current general counsel), pointing out that: "Disclosure is a subject we have considered, even before we knew the facts most recently disclosed."[74] He made several insightful observations/questions:

> Questions to be considered include:
>
> • Is "close personal relationship" sufficient to constitute "full disclosure" under the circumstances?

---

70 JW does not mention the large sums Freeman receives for origination credit of Jones cases.

71 Exhibit 6, Excerpts of Deposition of Nick Simms at 63-65; Exhibit 5.

72 Exhibit 2.

73 Exhibit 12 at 11.

74 *Id*. at 9-10.

- How are Liz, Judge Jones, and the Firm going to address press and other inquiries that may follow the making of such a disclosure, e.g., "what is meant by 'close personal relationship'"?, "Does this disclosure mean that Mr. Van Deelen's allegations of a romantic relationship were correct?Or that such a relationship now exists?If so, why wasn't this disclosure made earlier? Has this relationship been a factor, or the driving factor, in the rise to prominence of JW's bankruptcy practice in Houston?
- The draft disclosure disclaims any financial interest in cases before the Judge and asserts that no compensation is based on the firm's cases there. For the Firm to stand behind those assertions, Comp Committee would need to consider whether her compensation should be set without credit for any WAC or originations associated with cases in that court, as well as making the net income adjustment to eliminate sharing in profits derived from fees for cases in that court. This of course would need to be considered by all concerned.
- If the draft disclosure were made, what opportunity will that create for collateral attack on our recent cases in this court, at least going back to McDermott?Should any cases be reopened, what risk does that raise of claims by our clients against the firm for the additional expense they will incur?

Along with all of this, but perhaps on a separate or parallel track, is the question of candor in Liz's communications with the firm, both in 2021 and during the recent meeting with Pat and Julia.When the most recently disclosed facts are presented to the full Management Committee, there may be members who, even after careful and dispassionate consideration, conclude that a serious question is raised regarding fitness for partnership. When and how to address that issue also is going to take some time and care.

**2022 – Ethics Advice Part III**

**May 2022:**

- *May 3*: JW reaches out to Jarvis for additional advice.[75]
- *May 3*: Jarvis attempts to frame the issues:[76]

1. If a judge does not disclose a potential issue arising under §455 with respect to a case before the judge but a lawyer for one of the parties in the case actually knows of the issue, does the lawyer have a duty—either under the statute or under the Texas Rules--to make disclosure?
2. If a judge has an intimate personal relationship with a lawyer at a firm and also lives with that lawyer, is it sufficiently "full disclosure" (to the extent that full disclosure can be a cure under §455(a)) for the judge to say to counsel/parties to litigation pending before the judge that the judge has "a close personal relationship" with that lawyer (assuming for the sake of this question that the lawyer who lives with the judge is not actually involved in the representation and will not receive any fees as a result of the litigation)?
3. To the extent that disclosure plus waiver/consent in this situation can cure a potential problem under §455, does the party who receives the disclosure need affirmatively to express a waiver/consent or is the passage of time after disclosure and without objection sufficient?
4. To what extent does it seem that this situation is not within §455(a) but must be treated as the equivalent of a marital relationship?

- *May 3*: Cowlishaw also adds whether it is sufficient for the lawyer to make the disclosure or whether the judge must also disclose. He explains the Rule 2014 disclosure process and notes: "We looked at the rules related to this disclosure very early on and concluded that it technically requires disclosures only of relationships with interested parties, a term of art that does not include the presiding judge…"[77]
- *May 6*: Cowlishaw asks Jarvis to "keep the advice on this matter oral at the point."[78]
- *May 10*: Tom Kirkendall proposes a disclosure that states:[79]

---

75 *Id*. at 13-17.

76 *Id*.

77 *Id*.

78 *Id*.

79 *Id*. at 18.

> Elizabeth Freeman is a partner in the Firm. Ms. Freeman is a former law partner of the Honorable David R. Jones, Chief Bankruptcy Judge of the Southern District of Texas, at the Houston-based law firm of Porter & Hedges from 2009-2011. She is also a former briefing attorney for Judge Jones from 2011-2018. Ms. Freeman maintains a close personal relationship with Judge Jones. Consequently, Ms. Freeman does not appear in court or provide her professional services on the Firm's cases in Judge Jones' court, and Ms. Freeman has no financial interest in the Firm's cases in Judge Jones' court.

- *May 10*: Jaqueline Harvey (H&K associate):[80]

> I talked to William and updated him on the matter. I told him that Tom agrees that a disclosure by the firm is necessary, but that an agreement around the wording of that disclosure has yet to be determined. The firm has a disclosure to the Court due tomorrow. William believes at this point, they should continue with the old disclosure until this is sorted out, but wanted our confirmation.

- *May 11*: JW advises Jarvis that they do not intend to include the proposed disclosure in a filing the following day. "We may amend once we have a game plan.[81]

- *May 31*: Jarvis generates draft memo to JW (underlined text reflects the portions of the letter that were deleted in the subsequent draft):[82]

> This memorandum addresses what duties attorneys have when they know the judge presiding over their case has an undisclosed conflict of interest. <u>In summary, the lawyer has a duty to (1) disclose the conflict of interest to his or her client and (2) disclose the conflict of interest in the proceedings.</u>
>
> …
>
> The firm leadership was not aware of the Relationship until the last month or so. However, it appears several attorneys in JW's bankruptcy practice were aware of the standing of the Relationship for longer than a few months.
>
> …
>
> <u>Here, there is little doubt that a reasonable person knowing all the facts would believe that Judge Jones is impartial towards Ms. Freeman or JW when she or it appears in front of him.</u>
>
> …
>
> Even if Ms. Freeman does no work on a case, but a JW bankruptcy attorney appears in cases in front of Jude [sic] Jones, <u>a reasonable person knowing all the facts would nonetheless believe that Judge Jones' impartiality towards Ms. Freeman's firm bankruptcy practice, of which she is a leading member, would be affected.</u>
>
> …
>
> JW Attorneys have a Duty to Disclose the Conflict.
> <u>The conflict must be disclosed to JW clients whose cases are before Judge Jones.</u>
>
> …
>
> Here, there are several ways that the client's case may be impacted. First, if the relationship goes undiscovered then there is the possibility of beneficial or negative bias on the client's case as a result of the status of the Relationship. For example, if the Relationship was terminated then there is a chance Judge Jones may be negatively biased towards JW and its clients.

---

[80] *Id*. at 42.

[81] *Id*. at 22.

[82] *Id*. at 26-30.

> Even more impactful would be if the conflict was subsequently discovered because the cases may be required to start from the beginning. [citing cases]
>
> …
>
> As for present cases before Judge Jones, disclosures on the record and to clients are still necessary [even if Freeman leaves the firm].

- *June 2*: Jarvis sends a revised memo that eliminates most of the language from the prior memo, with one important point surviving:[83]

> **"In our opinion, disclosure by the lawyer to firm clients about the judicial conflict is necessary."**

- *June 9*: Jarvis talks to Tom Kirkendall about litigation risk.[84]

> "Does not want litigation to ensure [sic] where the firm and Liz are both criticized for coming up with this decamping situation as a way to get around the disclosure obligation."
> "**Agrees that disclosures need to be made to current clients before Jones** and, if Liz stays, all clients going forward"

**JW and Freeman contractually agree to keep the Relationship secret.**

**November 2022**

- *November 29*: JW and Freeman enter into a separation agreement with the following language:

> **Confidentiality**. JW and you agree that this Agreement, all of its terms and conditions, and all preceding discussions between you and JW, **regarding your relationship with Judge Jones** ("Covered Matters") are confidential and **shall not be disclosed or revealed to any third party**, except as specified below.

## V. ANALYSIS OF THE COVER-UP

### A. There is no question that JW "knew" of the Relationship.

#### (i) Key JW bankruptcy attorneys knew before the 2021 Allegations.

12. As Judge Moses has observed, there is no question that JW knew of the Relationship. First, equity partner Freeman, as a participant, of course knew. JW tries to lay blame at the feet of Freeman and Jones. (This blame is misplaced.) However, it is beyond argument that

---

[83] *Id*. at 31-40 (emphasis added).

[84] *Id*. at 41 (emphasis added).

Polnick (who discovered that Freeman and Jones owned a house in 2018) also knew. JW's attempts to deny knowledge of the Relationship are simply not credible in light of the contemporaneous texts showing knowledge. The knowledge of Freeman and Polnick pre-dated the Allegations.[85] By March 6, 2021, Cavenaugh knew at least about a prior Relationship.

**(ii) JW Does Not Investigate Despite Telling Co-Counsel (and Others) It Was Doing So**

13. Even though JW told others that it was investigating the Allegations at the time they arose, they were not. In fact, in its Preliminary Response to the U.S. Trustee's Rule 60(b) Motion, JW admits that in March 2021, after Freeman acknowledged a past Relationship, "[n]o further details were sought at that time."[86] The extent of JW's "investigation" seems to have been to ask Freeman, with zero effort to confirm the true facts. JW did not ask those closest to Freeman what they knew about the Relationship, or even trying to gather the most basic facts. JW has produced no evidence of a legitimate investigation (and has suppressed much of the investigation information as "privileged"). JW did not even run a simple search of the public records (available online), which would have disclosed that Freeman and Jones owned a house together – thus refuting a key fact JW cited to its Ethics Counsel.[87]

**(iii) JW Went into Cover-up Mode Rather than Inform its Clients or Anyone Else**

14. Instead of advising its clients after the Allegations arose, JW hired the PR Firm in the event JW was unsuccessful in suppressing the Allegations and their truth. As Judge Isgur observed, this failure to notify clients was a clear breach of JW's duties to its clients.[88]

---

[85] It should also be noted that texts were deleted from the phones of Graham, Polnick, and Cavenaugh, for reasons that have never been adequately explained. Critical evidence exists only because of an old iPad belonging to Polnick that survived the purge of texts. And even that iPad raises more questions. Polnick testified she provided it to counsel in May 2024. No excuse has been offered for why counsel held the texts until October 1 when they were produced.

[86] Case No. 20-20184, ECF 1244-1 at 3.

[87] Exhibit 10.

[88] Exhibit 1

15. The cover-up began at least as of March 8, when Polnick drafted a motion to seal the Allegations as "defamatory."[89] Polnick did this even though she knew there was truth to the Allegations. This was not an oversight. This was an intentionally deceptive act in furtherance of the cover-up.

16. The cover-up continued March 9 as JW ignored the advice of the PR Firm to be prepared to advise partners and clients of the Allegations. The PR Firm[90] warned JW that others would see the Relationship as "as a clear conflict of interest, at the very least."[91] Despite that warning, JW did nothing.

17. Also on March 9, Cavenaugh complained about a lack of sleep after spending three hours reviewing all of his prior declarations. This is, of course, because he must have recognized the gravity of his situation, as the declarations were submitted under penalty of perjury – let alone the gravity of the exposure of the firm as a whole. There is simply no way for JW to now contend there is not a problem with the sworn declarations.[92] Despite that concern, JW did nothing.

18. The cover-up continued March 10 as Cavenaugh, even after he admits he had learned of new circumstances, filed the Final Fee Application in the JCP Case – disregarding the Court's order that JW promptly advise of any new circumstances, facts, or connections that might constitute disqualifying circumstances.[93]

---

[89] Exhibit 4.

[90] The PR Firm offers services in "crisis communications." https://androvett.com/services/crisis-communications. JW's believed the "crisis" was protecting itself, not its clients.

[91] Exhibit 13 at 112 (emphasis in original).

[92] Of course, JW later expressly chose to disregard Ethics Counsel's admonition to file corrected declarations.

[93] Ironically, the Final Fee Application contained a copy of the Retention Order with the language that was being disobeyed. *See*, Case No. 20-20182, ECF 2739.

19. The cover-up continued throughout 2021, 2022 and 2023, and JW never advised JCP, the Court, or any parties of the Relationship. As Judge Isgur observed, this was, at a minimum, a breach of the firm's duties to its clients.[94]

20. The cover-up was furthered when JW misinformed its Ethics Counsel that Freeman was no longer working on Jones cases even though she continued doing so.

21. The cover-up continued with JW failed to alter its retention applications and supporting declarations of disinterestedness in a single bankruptcy case that was pending or subsequently filed.

22. The cover-up continued despite intense media scrutiny, multiple lawsuits, ethical referrals by the Fifth Circuit and the Southern District of Texas, and criminal investigations.

**B. JW Cannot Disclaim Liability Simply Because Upper Management was not Aware of the Relationship**

23. JW wants to claim that upper management was kept in the dark regarding the true nature of the Relationship – and thus JW should not be held responsible. Regrettably, this defense fails, for the following reasons:

- First, there is some question about exactly what upper management knew, as evidenced by Polnick and Cavenaugh observing in 2021 that Wade Cooper knows but doesn't "know know."[95]
- Second, management consciously elected not to conduct a full investigation. JW general counsel expressly struck the "investigation" language from the statement drafted by the PR Firm.
- But, most of all, after Wade Cooper astutely asked whether new disclosures might invite questions about prior disclosures, might cause cases to be reopened, and might then cause the firm to be sued, general counsel William Jenkins expressly refused Ethics Counsel's repeated admonitions to disclose in current and future cases and to notify JW's clients.[96] Instead, JW elected to go forward with the form of disclosure its

---

94 Exhibit 1.

95 Exhibit 9 at 43.

96 The JCP Case (No. 20-20182) was and is still open. To this day, JW has not informed its client.

Ethics Counsel deemed inadequate. Thus, the imprimatur of JW management was placed upon a disclosure the firm's management knew was misleading.

**(i) As of Spring 2022, Upper Management Unquestionably Knew of an Ongoing Relationship**

24. As of January 31, 2022, JW upper management absolutely knew that the Relationship was ongoing. Nonetheless, it waited two months to even question Freeman. When it finally did so, it informed Ethics Counsel of the ongoing Relationship. (Again, nothing suggests JW ever consulted bankruptcy experts but rather consulted a generalist in legal ethics. The discussion centered on general duties of counsel if it knows that the judge should recuse himself.) The Ethics Counsel advised that an attorney was committing an ethical breach if such attorney did not disclose the facts which might warrant recusal. Ethics Counsel advised that future and existing clients must be alerted and advised in favor of filing a proper disclosure.

**(ii) JW Intentionally Filed Disclosures It Knew are Misleading in New Cases**

25. After the managing partner raised the issue of what problems might be presented by new disclosures, JW general counsel specifically told its Ethics Counsel it was not going to make the disclosures the expert said should be made. William Jenkins told the Ethics Counsel JW would not make disclosures until it had a "game plan." However, the only game plan JW implemented was one of non-disclosure.

**(iii) JW Takes Six More Months to Separate from Freeman with No Disclosures**

26. JW took six additional months to separate from Freeman. It chose the path of separation rather than disclosure because it wanted to protect its lucrative complex case practice.[97] The firm chose not to disclose. But it kept practicing in front of Jones and even having Freeman work on the cases.

---

[97] Even though Freeman left JW, she continued to work on cases as "conflicts counsel."

27. Rather than notify its clients as its Ethics Counsel advised, JW entered into a non-disclosure agreement with Freeman promising not to tell third parties about the "relationship with Judge Jones."

**(iv) <u>JW Could Have Done the Right Thing – But Didn't</u>**

28. JW had many opportunities to make the required disclosure. JW did not do so because it wanted to continue with its multi-million-dollar practice. To the extent JW feels it was victimized, it victimized itself.

29. The evidence points inevitably towards a firm-wide coverup. JW asserts it cannot be held responsible for the poor judgment of lower-level partners and associates who knew of the Relationship and failed to disclose. That assertion is proven false by the plain fact that JW upper management, when they admittedly knew of the Relationship, chose to continue to file false and misleading disclosures for fear that a proper disclosure (as advised by Ethics Counsel) would invite scrutiny of prior disclosures, with the possibility of legal exposure.[98]

30. JW, while having the foresight to engage a PR Firm, never took the time to advise their clients of the issues. JW does not even pretend to offer any explanation for this lapse. As Judge Isgur observed:[99]

> Jackson Walker could not have ethically determined that the facts known to it should be hidden from its clients. Non-disclosure was a firm decision – not the decision of a single lawyer or even a single practice group at Jackson Walker. It is inconceivable that Jackson Walker failed to inform its clients of the situation. After all, it was the firm's duty to place the interests of its clients above its own interest. But, Jackson Walker allowed its clients to affirm the completeness of disclosure statements, to pay Jackson Walker's fees, and to include exculpation and release clauses in confirmed bankruptcy plans all without informing the clients of the relevant facts. Some or all of the clients might have refused to do so for practical reasons. Others might have determined that their own ethical standards would not allow them to wander into the ethics quaqmire precipitated by these events. But, Jackson Walker apparently did not

98 <u>Exhibit 12</u> at 9-10.

99 <u>Exhibit 1</u>.

> inform its clients. I have concluded that Jackson Walker's deliberate failure to inform its clients was an ethical breach that we cannot excuse.

31. The best excuse that JW offers is that the situation was unusual, uncomfortable, and awkward. That is undoubtedly true. But rather than confront the embarrassment and risk the future revenue, JW simply attempted to bury the problem. This does not meet any acceptable standards. Any time a firm is disregarding the advice of its Ethics Counsel, it is asking for trouble – and should not complain of the implications of its actions.

32. The inescapable conclusion is that JW's concern about losing the revenue stream outweighed:

- Following the terms of the Retention Order
- Filing proper disclosures
- Advising their clients
- Conducting a proper investigation
- Obeying internal guidelines established to prevent Freeman from working on Jones cases
- Retaining a bankruptcy expert regarding disclosure obligations
- Following the advice of their general Ethics Counsel

33. Rather than meeting its professional responsibilities, JW, at the very highest levels, participated in the cover-up. In its communications with its PR firm, JW refused to commit itself to the "highest" ethical standards. Unfortunately, it also failed to meet the minimum standards required by the law.[100]As Judge Isgur observed, JW's actions defiled the "very temple of justice" in which it practiced.

[100] "I would avoid holding us to higher than applicable standards and requirements (i.e., no 'highest standards')." Exhibit 13 at 105. "We understand the comments about 'highest standards.' Our judgment, for better or worse, is that we need to stay away from that or like phrases." *Id*. at 67.

## VI. LEGAL ANALYSIS

### A. JW's Violated Its Professional Obligations

34. JW is a law firm based in Texas, comprised of attorneys licensed to practice under the laws of the state of Texas, including, among others, the Texas Disciplinary Rules of Professional Conduct (the "Disciplinary Rules") and the Texas Rules of Disciplinary Procedure, as well as specific rules applicable to the courts and jurisdictions in which they are practicing. In the JCP Cases, JW is subject to the rules specified in the Bankruptcy Code, and the Federal Rules of Bankruptcy Procedure, the Local Rules of the Southern District of Texas, the Disciplinary Rules, and the U.S. Trustee Guidelines (as well as other sources). *See, e.g.*, Bankruptcy Code §§ 327-331; Bankruptcy Rules 2014-2017.

35. The retention of counsel representing bankruptcy debtors must be approved by the bankruptcy court, which can grant such application only if the attorney/firm (1) does not "hold or represent an interest adverse to the estate" and (2) are "disinterested." Bankruptcy Code § 327; Bankruptcy Rule 2014. In support of an application to be employed as counsel for a debtor, the attorney must file a verified statement identifying all "connections" with the parties in interest. Bankruptcy Rule 2014(a).

36. A debtor's attorney's obligations do not end once the court approves retention. The attorney's compensation during the case is also subject to court approval. *See*, Bankruptcy Code §§ 328-331; Bankruptcy Rule 2016. The court may deny allowance of compensation if, at any time during the case, the attorney "is not a disinterested person, or represents or holds an interest adverse to the interest of the estate." Bankruptcy Code § 328(c).

37. Rule 2014 does not require disclosure just for the sake of disclosure, nor is it the limit of counsel's disclosure obligations. Rather, full disclosure of all relevant facts is required to

ensure that counsel can and do execute their ethical and professional duties throughout the case, that counsel are eligible to be employed and compensated, and that the court itself does not have a disqualifying conflict. Because disclosure and transparency are critical to the integrity and legitimacy of every bankruptcy proceeding, failures to disclose are considered among the most serious ethical violations of bankruptcy lawyers, particularly if they are intentional.[101] Although Rule 2014 does not expressly require disclosure of connections with judges, that Rule is not the limit of counsel's disclosure obligations. Rather, counsel's disclosure obligations arise from this fiduciary duty in addition to the obligations imposed by the Bankruptcy Code, the Bankruptcy Rules, and the Disciplinary Rules. A counsel's duty to disclose "arises not solely by reason of the bankruptcy rules, but also is founded upon the fiduciary obligation owed by counsel for the debtor to the bankruptcy court."[102] The fiduciary duties owed by a professional include the duties of loyalty and care,[103] and in particular, a duty "to disclose any actual or potential conflicts of interest with the estate."[104]

38. The Local Rules of the Southern District of Texas incorporate the Disciplinary Rules. JW violated these rules by failing to disclose the Relationship. Lawyers "must be ever

---

[101] *See U.S. v. Gellene*, 182 F.3d 578, 586–90 (7th Cir. 1999).

[102] *Futuronics Corp. v. Arutt, Nachamie, & Benjamin (In re Futuronics Corp.),* 655 F.2d 463, 470 (2d Cir. 1981) (quotation marks omitted). *See also In re Huddleston*, 120 B.R. 399, 400–01 (Bankr. E.D. Tex. 1990) ("The case law is clear that the burden of disclosure is upon the person making the statement [of qualification for employment] to come forward with facts pertinent to eligibility and to make candid and complete disclosure.") (quotation marks omitted); *In re EWC, Inc.*, 138 B.R. 276, 279 (Bankr. W.D. Okla. 1992) ("[P]rofessionals performing duties for the estate are held to high fiduciary standards, and act as officers of the court."). And section 327(a) "implies a duty of continuing disclosure." In re Granite Partners, LP, 219 B.R. 22, 44 (Bankr. S.D.N.Y. 1998).

[103] *In re Hansen*, 220 B.R. 434, 454 (Bankr. N.D. Ill. 1998),

[104] *Jensen v. U.S. Trustee (In re Smitty's Truck Stop, Inc.)*, 210 B.R. 844, 850 (B.A.P. 10th Cir. 1997); *see also In re Food Mgmt. Grp., LLC*, 380 B.R. 677, 712 (Bankr. S.D.N.Y. 2008) (finding that the complaint stated a claim that debtor's counsel breached fiduciary duties by not disclosing relationship with successful bidder at auction); ICM Notes, 278 B.R. at 124 (fiduciary duties of debtor's counsel include "duty to exercise independent professional judgment on behalf of the estate and to disclose any actual or potential conflicts of interest with the estate"). Among other remedies, violation of these duties may "warran[t] a denial of all compensation to debtor's counsel." *Smitty's Truck Stop*, 210 B.R. at 850.

conscious of the broader duty to the judicial system."[105] All attorneys practicing before this Court "are required to act as mature and responsible professionals" and must comply, as "the minimum standard of practice," with "the Texas Disciplinary Rules of Professional Conduct."[106] As an office of the court, an attorney has an ethical duty to be honest.[107] At a minimum JW, breached Disciplinary Rules 3.03 (candor toward the court), 4.01 (truthfulness in statements to others), 5.01 (knowingly permitting ethical violations of another lawyer), and 8.04(a)(6) (assisting judges in violating the law or codes of conduct).

39. The broad duty of disclosure assists courts and parties with the necessary facts to review employment applications consistent with the Advisory Committee Notes to Rule 5002—which prohibits a bankruptcy judge from approving the retention of an attorney "if that person is or has been so connected with the judge . . . as to make the appointment or employment improper." Fed. R. Bankr. P. 5002(b)—states that professionals should make "appropriate disclosure" under Rule 2014 of their connections with a judge if those connections might render their employment improper.[108]

## B. JW is Responsible for the Actions of its Lawyers

40. At the time JW chose to ignore the advice of Ethics Counsel, did not require Cavenaugh and other JW attorneys to supplement already filed disclosures, proceeded to prosecute final fee applications with improper disclosures, and permitted the same misleading disclosures to

---

105 S.D. Tex. Loc. R., App. D(A).

106 S.D. Tex. Loc. R., App. A, R. 1(A).

107 *In re Consol. Bancshares, Inc.,* 785 F.2d 1249, 1258 n.8 (5th Cir. 1986). *See In re Brown*, 511 B.R. 843, 852 (Bankr. S.D. Tex. 2014) (J. Jones). *See also Gellene,* 182 F.3d at 587 ("[T]he omission of material information in a bankruptcy filing impedes a bankruptcy court's fulfilling of its responsibilities just as much as an explicitly false statement.") (quotation marks omitted) (affirming attorney's conviction for bankruptcy fraud); *Domain Prot., L.L.C. v. Sea Wasp, L.L.C.*, 23 F.4th 529, 543 (5th Cir. 2022) ("The duty of candor extends beyond not making false statements. An omission may also violate the duty.").

108 *See* Fed. R. Bankr. P. 5002(b) advisory committee's note to 1985 amendment.

be filed in new cases, JW endorsed the prior ethical and professional lapses as a matter of law. It has long been black letter law that one joining a conspiracy is liable for all acts of the conspiracy which might reasonably be anticipated, even those occurring before the joinder: "Persons having knowledge of a conspiracy who enter into it after its inception and before its consummation are liable for all acts previously or subsequently done in pursuance thereof."[109] This immemorial common-law principle has been widely accepted[110] and is simply a restatement of another well-settled principle of conspiracy law "that one who knowingly joins a conspiracy even at a later date takes the conspiracy as he finds it."[111]

**C. JW's failure to disclose the Relationship is an independent ground for disgorgement**

41. The duty to disclosure "connections" under Bankruptcy Rule 2014 is broader than the issue of conflicts and disqualification.[112] A professional has a duty to disclose *all* connections, regardless of whether the connection actually rises to a level that would disqualify the professional from employment under Bankruptcy Code § 327.[113] "The remedy for anything short of full disclosure is denial of compensation and disgorgement of sums already paid. No exceptions are made for slipshodness or good faith. This strict-liability principal is the law across the country."[114]

---

[109] 15A C.J.S. Conspiracy § 19, at 659 (1967), cit*ing, e.g., Standard Oil. Accord*, 12 Tex.Jur.3d Civil Conspiracy § 4 (1981); 16 Am.Jur.2d, Conspiracy § 56 (1979); 1 Eddy on Combinations § 376 (1901)

[110] *See, e.g., Industrial Building Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1343 (9th Cir. 1970); *Ratner v. Scientific Resources Corp.*, 53 F.R.D. 325, 329 (S.D.Fla.1971), appeal dism'd for want of juris., 462 F.2d 616 (5th Cir. 1972) (per curiam); *Blackstone Industries, Inc. v. Andre*, 232 Ga. 715, 208 S.E.2d 815, 816 (1974),

[111] *Myzel v. Fields*, 386 F.2d 718, 738 n.12 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968)

[112] *In re C & C Demo, Inc.,* 273 B.R. 502, 507 (Bankr. E.D. Tex. 2001).

[113] *Id*. (quoting *In re Olsen Indus., Inc.,* 222 B.R. 49, 60 (Bankr.D.Del. 1997)) ("A court may find a disclosure violation without holding that it would have found the law firm not disinterested given timely and complete disclosure.").

[114] *In re Chris Petit and Assocs., P.C.*, No. 22-50591, 2022 WL 17722853 *10 (Bankr. W.D. Tex. Dec. 13, 2022) (citations omitted) (emphasis added).

42. In the JCP Cases, as Judge Parker in *C&C Demo* explained, it was the failure to disclose itself at issue – the timing of inquiry is irrelevant; any lack of intent to hide the connection is irrelevant; consent (or lack of objection to) the retention is irrelevant; the quality of counsel's work or the fact the parties are pleased with the work is irrelevant; the degree to which the bankruptcy cases have progressed is irrelevant.[115] The Court cannot speculate as to whether JW's retention would have ultimately been approved if the Relationship had been properly disclosed, "because the disclosure omission by the Debtor's counsel precluded the Court from independently making that determination."[116]

> It s simply imperative that every doubt which might arise in the mind of a debtor's attorney in this area is construed in favor of disclosure, and every attorney seeking employment under § 327 must exercise dedicated diligence in disclosing and, if necessary, supplementing a prior disclosure, regarding any "connections" which he may have with the debtor, creditors, or other parties in interest or risk the consequences of any failure in that regard.[117]

43. Bankruptcy courts have the authority and duty to police the disclosure requirements with its sanction power, including to "order the disgorgement of all sums received by counsel and the forfeiture of all compensation paid to counsel in a particular case, regardless of whether the undisclosed connections were materially adverse or only of a *de minimis* nature."[118]

**D. JW was not disinterested, as a matter of law, because it breached its duties to JCP.**

44. Bankruptcy Code § 101(14) defines "Disinterested Person" as one who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in,

---

[115] *C & C Demo,,* 273 B.R. at 507-08.

[116] *Id.* at 508.

[117] *Id.*

[118] *Id.*

the debtor, or for any other reason."[119] Thus, by definition, "disinterested person" excludes anyone who possesses an interest adverse to the estate.

45. As Judge Isgur concluded in the Disciplinary Referral, JW breached its ethical duties to its clients by not disclosing the Relationship to them.[120] When JW breached its ethical duties, it was not "disinterested" as a matter of law. In other words, if JW had a duty to disclose the Relationship at the time it was retained or before it filed its Retention Application, or at any time subsequently, and failed to do so, then the JCP estate held a claim (breach of fiduciary duty) against JW.[121] A professional which the estate possesses a claim against cannot, by definition, be "disinterested."[122]

46. Since JW, through Freeman, Polnick, Cavenaugh, Graham, or any other JW attorney, knew of the Relationship, JW had an obligation to disclose the Relationship to JCP. Failure to do so means JW was not "disinterested" and was not qualified to represent JCP. Nonetheless, JW went forward with the representation in the JCP Cases and collected large amounts of fees.

**E. JW had imputed knowledge of the Relationship**

47. The knowledge of an attorney regarding connections with parties-in-interest must be disclosed by the law firm, and the law firm is responsible if the disclosures are not properly made. The actual knowledge of Freeman, Cavenaugh, Polnick, Graham, and other JW attorneys is imputed to JW as a matter of law. As the Fifth Circuit has recently confirmed, the knowledge of

---

[119] 11 U.S.C. §101(14)(C).

[120] *See* Exhibit 1.

[121] As Judge Isgur and JW's Ethics Counsel observed, there was a duty to inform the client. This was separate and apart from the duties imposed by the rules and orders of the Court.

[122] *See* 11 U.S.C. § 101(14)(A) (stating that a disinterested person "is not a creditor"); *See also, In re Pillowtex, Inc.*, 304 F.3d 246, n. 3 (3d Cir. 2002) (holding that if the estate possesses a claim against a professional such professional cannot be disinterested).

an agent (here, the lawyers) is attributed to the principal (here, the firm) for the purpose of liability.[123]

48. If JW, through Freeman, knew as of 2018 that the Relationship could render it disinterested, potentially making its retention improper, JW had a duty to inform JCP of that fact at the time JCP sought to retain it to file the JCP Cases. It did not do so. JCP paid JW's fees without proper knowledge.

49. Because Texas law imputes one attorney's knowledge to all those in the firm, JW was obligated to disclose what Freeman knew about Relationship throughout her tenure—before March 2021, between March 2021 and March 2022, and between March 2022 and November 2022, regardless of when others at JW knew definitively of the Relationship. "Texas law imputes one attorney's knowledge to all attorneys in a firm."[124] Likewise, "[p]artners at firms are . . . charged with knowing about the misdeeds. . .of the attorneys that they employ and supposedly supervise."[125]

### F. JW Violated the Terms of the Retention Order

50. The Court entered the Retention Order on July 1, 2020.[126] Notably, the Retention Order required disclosure beyond what is required under Rule 2014. The Retention Order

---

[123] *See In re Black Elk Energy Offshore Operations, LLC,* 114 F.4th 343, 354-56 (5th Cir. 2024) (finding that even an agent's knowledge of her own fraudulent acts can be imputed to the principal when those acts are within the scope of the agent's duties).

[124] *Tesco American, Inc. v. Strong Indus., Inc*., 221 S.W.3d 550, 553 (Tex. 2006) (reversing appellate decision because one judge had conflict stemming from prior firm's representation of party while she was lawyer with the firm, although she was unaware of it). *Unauthorized Practice of Law Comm. V. Am. Home Assurance Co., Inc*., 261 S.W.3d 24, 40 (Tex. 2008) ("Texas law imputes knowledge of confidential information to counsel's lawyer-associates so that in a private law firm, all of the lawyers are irrebuttably presumed to have knowledge of the confidential information."); *Nat'l Medical Enters., Inc. v. Godbey*, 924 S.W.2d 123, 131 (Tex. 1996) ("The attorney's knowledge is imputed by law to every other attorney in the firm.")

[125] *In re Bradley,* 495 B.R. 747, 791 (Bankr. S.D. Tex. 2013) ("Knowledge and actions are said to be imputed to all members of a firm; [the] managing partners, are therefore charged with [the employee attorney's] knowledge and actions.").

[126] Case No. 20-20182, ECF 963.

instructed JW to file a supplemental declaration if "any new relevant facts or relationships are discovered or arise":

> ORDERED that Jackson Walker LLP will review its files periodically during the pendency of these chapter 11 cases to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, Jackson Walker LLP will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration, as required by Fed. R. Bankr. P. 2014(a); it is further

51. The Retention Order's requirement of continued disclosure is consistent with the law.[127] After the Retention Order was entered, JW never supplemented the Cavenaugh Declaration to disclose the Relationship. This failure goes beyond an innocent oversight. As discussed above, at least as of the Allegations made on March 6, 2021, Cavenaugh consciously knew that his declarations might be considered false and even spent three hours on March 8, 2021, re-reading his declarations in prior cases.

52. Apparently ignoring the purpose of disclosure and despite knowing about the Relationship, JW did not supplement its disclosures and instead filed its Final Fee Application[128] on March 10, 2021 (less than 12 hours *after* a hearing in another case that directly related to JW's failure to disclose the Relationship). On April 5, 2021, JW certified the absence of objections to the Fee Application.[129] Even in the face of the Allegations, Jones approved the Final Fee Application on April 8, 2021, approving JW's fees and expenses incurred from the Petition Date through Confirmation, in the amount of $1,101,482.21, without requiring further disclosure. The

---

[127] See*, e.g., C&C Demo*, 273 B.R. at 507, quoting *In re Granite Partners, L.P.,* 219 B.R. 22, 33 (Bankr.S.D.N.Y.1998) ("Continuing disclosure is necessary to preserve the integrity of the bankruptcy system by ensuring that the trustee's professionals remain conflict free.")

[128] Case No. 20-20184, ECF 2739.

[129] Case No. 20-20184, ECF 2854.

Retention Order expressly required JW to supplement its declaration "if any new facts or relationships are discovered or arise." JW did not do so, and the terms of the Retention Order were clearly violated.

53. Even assuming JW attorneys other than Freeman did not have knowledge of the Relationship until March 6, 2021, at that moment, it had a duty to inform JCP and the Court that it was no longer disinterested, and that, in fact, it had not been disinterested at the time JCP retained JW to represent it. It did not do so, and, instead, hurriedly sought final approval of all fees incurred during the JCP Cases. JW made the conscious decision not to disclose the Relationship despite its obligations to do so under the Bankruptcy Code, the Bankruptcy Rules, and the Disciplinary Rules and because of its fiduciary duty. This was willful misconduct by JW.[130]

## VII. CLAIMS FOR RELIEF

### A. Cause of Action No. 1 –Breach of Fiduciary Duty

54. Paragraphs 1-53 above are realleged and incorporated herein by reference.

55. JW owed fiduciary duties to JCP, including but not limited to duties of loyalty, candor, and full disclosure. As JCP's estate-retained professional in a Chapter 11 bankruptcy proceeding, JW had an obligation to act with the utmost good faith and integrity in all dealings related to its representation.

56. During the course of its representation, Freeman engaged in an undisclosed intimate Relationship with Jones, the presiding judge in the JCP Cases. The Bankruptcy Rules, Bankruptcy Code, Local Rules, and the Disciplinary Rules, required disclosure. JW was aware of the

[130] *In re eToys, Inc.*, *331 B.R. 176, 187 (Bankr. D. Del. 2005)* (holding a knowing failure to disclose a conflict of interest "constitutes willful misconduct").

Relationship and failed to disclose the Relationship at any time during the engagement or JCP Cases.

57. JW owed a fiduciary duty to JCP. Its failure to disclose the Relationship at the time it was retained by JCP and/or prior to seeking final approval of its fees and its failure to follow court orders concerning its employment was a breach of that duty.[131] To the extent JW claims that it did not know about the Relationship, it is nonetheless vicariously liable for breach of fiduciary duty because it is the employer of the individuals who willfully violated their duties to JCP. Specifically, when Cavenaugh submitted the Final Fee Application knowing the Retention Order had been violated, JW was also liable.

58. JW's breach of its fiduciary duties to JCP constitute a clear and serious violation of the law.[132] Plaintiff seeks disgorgement of all legal fees paid to JW based on the following factors:

- Gravity and Timing of the Violation: JW breached its ongoing duties when it concealed the Relationship. The breach occurred before and during the pendency of the JCP Cases, when JW owed its highest duty of loyalty to JCP.
- Willfulness: JW's failure to disclose the Relationship was intentional. As a partner at JW, Freeman's knowledge of the Relationship is imputed to JW. JW knew or should have known it was required to disclose the Relationship to JCP, the Court, and other parties in interest.
- Effect on Value of Legal Work: Although JCP does not complain about the quality of the JW's legal work in the JCP Cases, the value of that work has been compromised because of the failure to disclose the Relationship. The UST has filed a motion seeking to vacate the Retention Order and the Compensation Order, which puts all of the work accomplished in the JCP Cases at risk.
- Harm to Client: JCP has incurred significant expense as a result of JW's breach of its fiduciary duties. While JW complains that Plaintiff has needlessly incurred "hundreds of thousands of dollars in legal fees actively participating in [the Fee Dispute]," Plaintiff concluded that its participation was necessary in order to protect its right to any recovery obtained by the UST.[133] In fact, JW

[131] *See, generally,* Exhibit 1.

[132] *Thomas v. Hughes*, 27 F.4th 995, 1014 (5th Cir. 2022).

[133] *See* Exhibit 1.

itself suggested to the Court that Plaintiff was a necessary party to the Rule 60B proceedings.

- Adequacy of Other Remedies: There are no other remedies under the law that will make JCP whole. Fee forfeiture is necessary to deter future misconduct.
- Public Interest: The public has a strong interest in maintaining the integrity of the attorney-client relationship and the administration of justice, especially in federal bankruptcy proceedings. Allowing JW to retain fees under these circumstances would undermine public confidence in both the legal profession and the judiciary.

**(i) Disgorgement of fees in the JCP Cases for Failure to Make Rule 2014 Disclosures**

59. JW's failure to disclose the Relationship as required by the Bankruptcy Code and Bankruptcy Rules, justifies disgorgement of all fees it received from JCP.

60. As explained by the Fifth Circuit:

> Courts may deny all compensation to professionals who fail to make adequate disclosure, and 'counsel who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation.'[134]

"A bankruptcy court should punish a willful failure to disclose the connections ... as severely as an attempt to put forth a fraud on the court."[135]

61. Full disclosure is mandatory, and less than full disclosure may result in disqualification and denial of all compensation, regardless of whether the undisclosed connections were materially adverse to the estate.[136]

**(ii) Disgorgement of Pre-Petition and Post-Confirmation Fees under Texas Law**

62. JW's continued failure to disclose the Relationship to JCP and the Court was intentional, flagrant and inexcusable. An attorney's breach of its fiduciary duty to its client may

---

134 *In re Am. Int'l Refinery, Inc.,*676 F.3d 455,465–66(5th Cir. 2012) (quoting West Delta OilCo., 432 F.3d 355 (5th Cir. 2005)).

135 *In re Crivello*, 134 F.3d831, 839 (7th Cir. 1998).

136 *In re Gulf Coast Orthopedic Ctr.*, 265 B.R. 318 (Bankr. M/D/Fla.2001).

result in disgorgement of the fees paid by the client to the attorney. The primary purpose of disgorgement is to protect relationships of trust by discouraging disloyalty, rather than to compensate the injured party.[137] Courts may order disgorgement of fees or profits wrongfully obtained by the fiduciary as a remedy for such breaches. Id. Furthermore, a client need not prove actual damages to obtain forfeiture fees as a remedy for breach of fiduciary duty.[138]

63. Based on the conscious and willful actions (and inactions) of JW discussed above, Plaintiff requests full disgorgement of all fees paid to JW in connection with the JCP Cases, including pre-petition, prior to confirmation, and post-confirmation.

**B. Cause of Action No. 2 – Negligence**

64. Paragraphs 1-53 above are realleged and incorporated herein by reference.

65. JW failed to put policies and procedures in place to prevent the failure to make proper disclosures. It also failed to supervise its lawyers to ensure they met their professional and ethical obligations. Even when JW admitted that it heard allegations about the Relationship, it failed to exercise normal care to investigate the facts. As only one example, JW waited months to interview Freeman. JW did not even ask Polnick or other attorneys with knowledge of the Relationship what they knew about it. As a result, JCP was never told of the Relationship by JW.

66. Disgorgement is a proper remedy for an attorney's violation of disclosure obligations under the Bankruptcy Code and Rules, even if the failure to disclose was due to negligence or inadvertence. *C & C Demo,* 273 B.R. at 507.

---

[137] *Burrow v. Arce,* 997 S.W.2d 229, 241 (Tex. 1999); *Diakiw v. Stites Mgmt., L.L.C.*, 693 S.W.3d 582 (Tex.App.—Houston [14th Dist.] 2023, pet. denied).

[138] *Id.*

## VIII. CONCLUSION

67. This is not a proud moment for the profession. JW's actions have cast a pall upon the entire bankruptcy practice. Each fact that has been developed in this matter has simply made the situation look worse, not better. The repeated lapses of professional responsibility are damning. What may have started with dissembling led to an active cover-up after Van Deelen found out about the Relationship, and panic ensued. Lapses that began at lower levels of the firm were formally adopted and endorsed by firm management which intentionally disregarded the firm's duties, and the Ethics Counsel's advice. As Jones himself once expressed, such actions erode trust in and do great damage to the entire system:[139]

> I think that we all owe a duty to the process. It's the process that works. It's the professionals in the process that make the process credible or not…
>
> The only thing I want to tell you all is the bankruptcy process itself is extremely, extremely fragile. It depends upon a level of trust between the Bench and the Bar and the Bench and the professionals that doesn't exist in any other court system.

68. Despite JW's imputed knowledge of the Relationship at the time JCP retained it, and despite actual knowledge no later than March 7, 2021, JW never apprised JCP of the Relationship and never supplemented its disclosures as required by the Retention Order and the Bankruptcy Code. JW's failure to disclose in and of itself negated the "disinterested" requirement as a matter of law. Instead of issuing a supplemental disclosure, JW proceeded to file the Final Fee Application immediately when news of the Relationship threatened to become public. At a minimum, JW had a duty to inform JCP of the allegations and the potential risk.

69. JW's failure to properly inform JCP of the Relationship was a breach of its duties to JCP. Its failure to implement proper procedures to avoid or correct the non-disclosure was

---

139 *In re Westmoreland Coal Co.,* Case No. 18-35672, ECF 3206.

negligent and a breach of its fiduciary duties. The law does not require actual harm to disgorge JW of its fees, and JW's fees paid by JCP should be disgorged in full. In addition, JCP has suffered additional damages as a result of the nondisclosure because of the investigation and various proceedings designed to uncover the depths of JW's actions. JCP should also be awarded those damages.

Dated: May 1, 2025 Respectfully submitted,

STREUSAND, LANDON, OZBURN
& LEMMON LLP

By: *<u>/s/Stephen W. Lemmon</u>*
Stephen W. Lemmon
State Bar No. 12194500
lemmon@slollp.com
Rhonda Mates
State Bar No. 24040491
mates@slollp.com
1801 S. MoPac Expressway, Suite 320
Austin, Texas 78746
(512) 236-9900; (512) 236-9904 (Fax)

**ATTORNEYS FOR OLD COPPER COMPANY, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing instrument has been served on this 1st day of May 2025 upon all parties registered to receive such electronic notices in this case via this Court's ECF Notification system.

*/s/ Stephen W. Lemmon*
Stephen W. Lemmon